## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 08 2019, 6:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle L. Flora
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re Matter of the Involuntary Termination of the Parent-Child Relationship of: J.J.E. (Child) | November 8, 2019 |
| | Court of Appeals Case No. 19A-JT-1339 |
| C.L.E. (Father), | |
| *Appellant-Respondent*, | Appeal from the Allen Superior Court |
| v. | The Honorable Charles F. Pratt, Judge |
| Indiana Department of Child Services, | Trial Court Cause No. 02D08-1809-JT-313 |
| *Appellee-Petitioner*. | |

**Brown, Judge.**

[1] C.L.E. ("Father") appeals the involuntary termination of his parental rights to his child, J.J.E. We affirm.

## *Facts and Procedural History*

[2] J.J.E. was born to M.E. ("Mother") on February 21, 2016, and began to reside with a foster family on March 7, 2016.[1] On May 16, 2016, the court found that J.J.E. was a CHINS. At some point in late 2016, Father was incarcerated. While Father was detained by the Allen County Sheriff's Department, the Indiana Department of Child Services ("DCS") had him tested and found that he was J.J.E.'s biological father.[2] The court issued an Order on Additional Initial Hearing on September 26, 2016, stating that Father appeared and admitted all of the allegations in the petition alleging J.J.E. was a CHINS. The court issued a dispositional order the same day requiring that Father refrain from all criminal activity, maintain appropriate housing, cooperate with all caseworkers and the court appointed special advocate, immediately provide caseworkers with accurate information regarding paternity and finances, submit to a diagnostic assessment within one month and follow all recommendations, commence proceedings to establish paternity with the prosecutor, submit to random drug screens, refrain from the use of alcohol or illegal drugs, attend and

---

[1] J.J.E.'s half-sibling is also placed with the foster family.

[2] The court's termination order states that paternity was established in Father by court order on December 1, 2016.

appropriately participate in all visits with J.J.E. as directed, and notify DCS within forty-eight hours of his release. Father was released from incarceration on September 21, 2017, and was reincarcerated on June 6, 2018.

[3] On September 25, 2018, DCS filed a petition for termination. On February 18, 2019, the court held a factfinding hearing. Father testified that he was incarcerated and, when asked why, replied "I'm in there for – I've got six (6) felonies or five (5) felonies. I can't remember. I just kind of let my lawyer deal with that. Yep." Transcript Volume 2 at 16. He testified that he had just signed a plea agreement for two years executed in the Department of Correction (the "DOC") and stated "I've got eight (8) months left. With CPT I'll be out in five (5) months" and that sentencing was approaching. *Id.* at 16-17. When asked "[w]hat is CPT," he replied: "CTP, it's like a house arrest program."[3] *Id* at 17. He also stated that he would then have three years of probation. He stated that he previously served eleven months beginning in late 2016 for possession of a hypodermic syringe.

[4] When asked if he recalled that the court entered orders regarding his participation in the underlying CHINS case, Father replied affirmatively. When asked if he was able to notify DCS of changes in his housing and employment, he stated "[n]o," "I felt that I should just go through [Mother] so I tried calling her one (1) time and she turned me down and I just – I was like

---

[3] The transcript shows that Father first referred to "CPT" but then later to "CTP." *See* Transcript Volume 2 at 16-17.

skip it," "I'll see him in the future because she was planning on keeping on him and that's the reason why I didn't fight." *Id*. at 21. When asked if he contacted the caseworker to have visitations, he replied "[n]o, I lost his information." *Id*. at 22. He indicated that he did not complete a diagnostic assessment. When asked if he complied with submitting to random drug testing, he answered "[n]o, anything that you're going to ask me about complying I can say I didn't do it because like I said I thought she was taking full responsibility of him and I just rather like him be with his mother." *Id*. at 22-23.

[5] When asked "at this time you'd agree you are noncompliant with most of your services with the exception of the establishment of paternity," he answered "[y]es sir, you're correct." *Id*. at 23. When asked if he had ever visited J.J.E. since he was born, Father answered in the negative. Father testified that, although he was locked up, he has two brothers who work and take care of his other child and "when I get out I will get a good job and I will pick up an extra job to keep me out of trouble." *Id*. at 25. When asked if he had been employed between his two periods of incarceration, he replied "[n]o sir, I've never had a job in a day in my life but - so I'm planning on getting one and changing my life." *Id*. He stated that his brothers power-washed trucks and that he had a friend who said that he would get him a job at a pallet company. When asked if he ever gave Mother money to pay for diapers or formula, Father replied "[s]he told me to go through [family case manager Anthony Eley] like she had an attitude problem. She said I was on drugs." *Id*. at 27.

[6] Mother testified that she had been clean for twenty-six months, that during that time she had checked herself into a halfway house, that J.J.E. has been with his foster parents since he left the hospital and he and his foster mother have a bond, and "it's in [J.J.E.'s] best interest." *Id*. at 32. She indicated that she wanted J.J.E. "to be adopted where he's at." *Id*. at 33. When asked why she had concerns about Father having contact with J.J.E., she replied "[b]ecause [J.J.E.] doesn't know who he is" and Father "still gets out and uses and he's gotten needle charges." *Id*. at 34. The court also heard the testimony of J.J.E.'s foster mother related to the foster home, J.J.E.'s needs, and the two other children in the home, one of whom was J.J.E.'s half-sibling.

[7] Family case manager Anthony Eley ("FCM Eley") testified that, since paternity was established, Father never contacted him to ask for visitation with J.J.E., to inform him that he had been released from incarceration, or to update him of any changes in his address, employment, or telephone number. FCM Eley testified that he ran into Father at a mall soon after he was released from incarceration, they briefly discussed Father's case, he gave Father his phone number, and Father gave him a phone number and said it belonged to his brother but there was no answer when he called the number. He testified that J.J.E. considers his foster parents to be his parents and is thriving and that he believed that Father's rights should be terminated.

[8] Court Appointed Special Advocate Suzanne Lange ("CASA Lange") testified that she believes it is in the best interests of J.J.E. to be adopted in the home in which he currently resides through a termination of Father's parental rights and

the voluntary consent of Mother. She testified that the foster home was the only home that J.J.E. has known, he has bonded relationships there, Father has not complied with any part of his parent participation plan except that paternity was established, and that his criminal history is extremely concerning.

[9] On May 15, 2019, the court issued its Findings and Order Terminating Parental Rights providing in part:

> 10. From the testimony of [Father], the Court finds that in August or September 2016 to October or November 2016 he lived . . . in Fort Wayne, Indiana. He was jailed on or about October/November 2016 until September 2017. He was again arrested in June, 2018. His incarceration has continued. He has pled guilty to several felony charges and has entered a plea bargain through which he will be incarcerated through the Department of Corrections beginning in March 2019 followed by a period of house arrest and probation.
>
> 11. . . . the Court finds that [Father's] most recent incarceration stems from his arrest on June 6, 2018. On that date, the police were dispatched to the home of a woman later identified as [Father's] former girlfriend. The police responded to a call with regard to a violation of a protective order. They found [Father] hiding in a hole in the basement of the former girlfriend's home. Upon his apprehension a struggle ensued resulting in additional charges of resisting law enforcement and assault on a police officer.
>
> * * * * *
>
> 16. From the testimony of [FCM Eley], the court finds that [Father] did not maintain contact with the Department during the periods of his release for [sic] incarceration. [Father] has not completed a diagnostic assessment as ordered and has not submitted to random urinalysis testing.
>
> 17. [Father] acknowledged that he has not completed services because he believed [Mother] would take care of the matter.

18. [Father] admitted that he has not visited the child. He has never had a job and is not presently able to provide for the child.

19. At the time of the close of evidence on the termination parent rights Factfinding, [Father] was unable to provide for the child's food, clothing, supervision, or shelter.

20. From the testimony of . . . the [] child's licensed foster mother, the Court finds that she is interested in adopting the child. She has not had any contact with [Father] with regard to the child.

21. [Mother] has concluded that the child's adoption by [foster mother] is in the child's best interests. She believes that the child is bonded to his foster parents. She too has a positive relationship with them and they have discussed an open adoption arrangement.

* * * * *

24. [CASA] has concluded that the child's best interests are served by the termination of parental rights. In support of her conclusion she cites [Father's] failure to complete services.

BASED ON THE ABOVE FINDINGS OF FACT THE COURT APPLIES THE RELEVANT STATUTORY LAW AND CONCLUDES THAT:

* * * * *

2. . . . By the clear and convincing evidence the court determines that there is a reasonable probability that reasons that brought about the child's placement outside the home will not be remedied. [Father] has had periods of incarceration through the term of the underlying CHINS case. Correspondingly, there was a period during which he was not in jail and could have participated in services. He did not. By his own admission he chose to rely on [Mother] to resolve the issues. His arrest resulting in his current incarceration came about as a result of his voluntary choice. As a result he is unable to provide for the child's care, shelter, and supervision at this time.

* * * * *

4.	[DCS] has thus proven by clear and convincing evidence that the allegations of the petition are true and that the parent-child relationship should be terminated.

Appellant's Appendix Volume 2 at 5-7.

## Discussion

Father claims the evidence does not support the trial court's judgment. He argues that paternity had not been established at the time of the CHINS adjudication, that his family can provide for J.J.E. while he is incarcerated, that he expected to be released within five months of the termination hearing, and that he has arranged for housing and employment and has maintained sobriety for two years. The State responds that the court did not clearly err and that Father does not challenge the accuracy of the court's factual findings. It argues that, at the time of the termination hearing, J.J.E. had been living with his foster family for about three years. It further argues that Father was not incarcerated from September 21, 2017, through June 6, 2018, and that, during that period, he did not contact DCS, visit J.J.E., obtain a job, find suitable housing, or participate in reunification services.

In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[12] A finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence. Ind. Code § 31-37-14-2. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*. Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id*. Our review must give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand and not set aside its findings or judgment unless clearly erroneous. *Id*. As a case that seems close on a dry record may have been much

more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence. *Id*. at 640.

[13] The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). In determining whether the conditions that resulted in a child's removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.* The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013).

[14] A court may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, lack of adequate

housing and employment, and the services offered by DCS and the parent's response to those services. *Id*. Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.* A parent's habitual patterns of conduct must be evaluated to determine the probability of future neglect or deprivation. *See K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1231 (Ind. 2013). Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children. *Id.* at 1235-1236.

[15] To the extent Father does not challenge the court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge the trial court's findings resulted in waiver), *trans. denied*.

[16] The trial court found that Father was incarcerated from October or November of 2016 until September 2017 and was again incarcerated in June of 2018 and that his June 2018 incarceration related to his arrest for violating a protective order and resisting law enforcement. It found that Father did not maintain contact with DCS when he was not incarcerated, has not completed services, has not held a job, is unable to provide food, clothing, or shelter for J.J.E., and has not visited J.J.E. The testimony and evidence admitted at the factfinding hearing as set forth above and in the record supports the court's findings. Father continued to engage in criminal activity, stated that he never visited

J.J.E., did not contact FCM Eley in an attempt to visit J.J.E., and did not contact DCS when he was not incarcerated. Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to J.J.E.'s removal will not be remedied.

[17] In determining the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). The court must subordinate the interests of the parent to those of the child. *Id.* The recommendation of the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*. FCM Eley and CASA Lange recommended the termination of the parent-child relationship between Father and J.J.E. Based on the totality of the evidence, we conclude that the trial court's determination that termination is in J.J.E.'s best interests is supported by clear and convincing evidence.

[18] Affirmed.

Altice, J., and Tavitas, J., concur.